235613 United States of America v. David W. Suetholz, oral argument not to exceed 15 minutes per side. Mr. Wicker for the defendant appellant. Good morning. Good morning and may it please the court. My name is Kent Wicker. I represent the appellant, Dr. David Suetholz. I'd like to reserve 3 minutes for rebuttal. Very well. This case is what the Supreme Court was talking about in Rwan v. United States when it stressed the importance of, quote, separating innocent conduct and, in the case of doctors, socially beneficial conduct from wrongful conduct. Unlike many of the cases that come before you, this was not a pill mill case. Dr. Suetholz is not a pain doctor. He's a family physician and he has practiced family medicine for 40 years. There was no allegation that he was systematically over-prescribing narcotics. The three patients at issue here... There was no evidence he was not. I thought the Kentucky Medical Board investigated him and found that he had. Not systematically, Your Honor. What you're talking about is a 12-year-old disciplinary case in which Dr. Suetholz reached an agreed disposition. He denied the allegations but, as in many cases, agreed to a settlement with the Medical Board. They concerned largely record-keeping, although there were some patients in which the examiner thought Dr. Suetholz prescribed more narcotics than necessary. But what was important here was that none of those patients were part of the indictment. I mean, you start out by saying he's never systematically over-prescribed and I just think that's just inaccurate. I mean, he's got a history of over-prescribing. No, Your Honor. I respectfully disagree and that was not the evidence below. On the Medical Board procedure that addressed some particular patients and the overriding fact is that there was none of those patients were over-prescribed. None were listed in the indictment and the one patient that was in common, W.Y., the Medical Board examiner found no fault in his prescriptions for this patient. So this was not part of the charges. And if it was supposed to give notice to him that his conduct should be changed, what it told him was that his prescriptions for W.Y. were appropriate. I'm sorry, I didn't quite understand. It did not give him notice that his practices should change or it did give him notice? It did not. It should not. Even though he signed a consent with the Medical Board to improve his practices, to do better record-keeping, that didn't give him notice? And he improved his practices. What I was saying, Your Honor, is that this was not noticed that what he was doing to these patients in the indictment was improper. These were different patients. The patient that was in common, the Medical Board found no problem with the way he was prescribing there. So what we have here is different than before Ruan. You have to find a subjective intent to do something that the law forbids, to issue unauthorized prescriptions. And the only evidence that was heard by the court was that he was trying to help these patients, that he was trying to address their conditions, that he was trying to make them better. Well, that's not the only evidence, of course. I think the jury carefully evaluated the case. They were hung as to patients DW and AC, but they convicted your client of LP, DK, and WY. And I thought it was significant that those are the three patients who failed their drug tests, and then your client stopped giving them further drug tests after they failed, and then continued to give them the controlled substances after they were no longer tested because, after failing. And I think that shows some consciousness of inappropriate activity that when you no longer test your clients when you know they failed it, and then you still give them the drugs. I mean, how do you address that? Your Honor, these were not failed drug tests. These are better termed as aberrant drug tests. I'm sorry, I didn't hear that. They were what tests? Aberrant. They were different. They needed further inquiry. These were not tests in which showed that the patient was taking some kind of unprescribed narcotic, cocaine, marijuana, something else. They were tests in which the prescribed drug wasn't present in the test at that time. And that can be for a number of reasons. One is that they're just prescribed PRN as needed. But an aberrant drug test, wouldn't that require a follow-up drug test to make sure that they are not addicted to other substances that may kill them if they get these controlled substances? Yes, Your Honor. And the evidence showed that's what he did. He did follow up with additional drug tests? For some of the patients, yes. I thought these three didn't receive any further drug tests. They did, Your Honor. W.Y. in particular, W.Y.'s, the records of his drug tests show Dr. Sudholz had examined the test results. He wrote a note to himself, further tests and pill count. What a drug test in which the drug doesn't show up means is that perhaps he had a bad month and he used up all the pills earlier in the month. Dr. Sudholz doesn't give early refills. Or he could have had a good month and didn't need the drug in that last week before the test was taken. But what's important is that a doctor use his medical judgment, examine the test, discuss it with the patient and make medical decisions based on that. And that's what the proof was from A.C. and other patients who talked about how he talked with them about their drug tests. Can I ask you a little bit? There's a lot of evidence in the case and perhaps the jury could have seen it in different ways. But the jury looked through all the facts here and they have to do it within the lens of the particular instructions that the judge gives. And I noticed in kind of your follow-up letters, your friend's follow-up letters with the Stanton case and your response to it, there's questions about the jury instruction here. And whether the kind of deliberate ignorance instruction can meet the Ruan standard in this case. I was wondering if you might address that. Yes, Your Honor. The court has repeatedly stressed that such instructions should be approached with significant prudence and caution and be used sparingly. But we just sanctioned it in Stanton. Using that instruction at least for a conspiracy case. Yes, Your Honor. But in a case such as this one, what the court said in Stanton and the court has said in other cases is that there has to be some evidentiary reason to use that instruction. There has to be some indication that the doctor is claiming ignorance as a defense. That wasn't the case here. And in fact, when he gave an hour and 45 minute interview to the law enforcement agencies, he said, I can tell you about all these patients. But he is claiming ignorance, is he not? Doesn't he claim that he was unaware that these patients were using other drugs? And he claims that, oh, I didn't know that. And that's claiming ignorance, isn't it? Well, only LP died of a heroin overdose. Sure. And he claims he didn't know that he was taking heroin. And if he's deliberately ignorant, I mean, that's circumstantial evidence that he may have knowledge. But there had to be some kind of red flags that he was ignoring. What the deliberate, and there's no... There's no red flags. No, you just told me there has to be evidence of, what did you say, lack of knowledge or a claim of lack of knowledge. And that's exactly what he's claiming here. Well, a claim of a lack of knowledge of something that should have put him on notice. Yes, the fact that his clients are using heroin and other drugs and he still gives them these opioids. But there was no indication that he knew or should have known that LP was taking heroin. LP's girlfriend testified... Well, isn't that for the jury, isn't that a factual issue? And that's why the deliberate ignorance instruction is given, so that the jury can consider it. And it's a factual issue, isn't it? But there has to be a factual, a fact that he's claiming he was ignorant of. Okay, I just, I guess I don't want to argue with it. The fact that he claims he doesn't know his clients were using heroin in addition to the opioids. And that, well, he knew that two of them died, I guess, from the same thing. I mean, I think that's claiming ignorance, that's all. And the instruction, as I'm reading it, I have instruction 15 here, you have to deliberately ignore that the doctor was prescribing controlled substances outside the usual course of professional practice. That you were doing something that didn't have a legitimate medical purpose. And being ignorant of that, not necessarily one particular fact about one particular plaintiff. I take it it was the doctor's position that he didn't think that he was violating the medical standard. That's right, Your Honor. And we heard testimony from two of the patients who were charged in the indictment who talked about how he treated them. But couldn't we say, I mean, he knew medical standards about what happens with record keeping. He knew medical standards about what happens when somebody fails a urine test and what that might indicate about their unlawful use of the prescribed substances. And if he's saying, well, I didn't take, I wasn't aware that my practices were therefore violating the standard of care, isn't that deliberate ignorance of how his practices are deviating from what the line is? Well, that wasn't his defense, Your Honor, respectfully. His defense was that he was treating these patients in a manner which was helpful to them. In the manner that he believed was appropriate in his medical judgment. There are advisory guidelines, but they're not the law. They state within those CDC guidelines that the physician should use his medical judgment. And that's what he did in this case. One thing I do want to point out as I'm running out of time, that two of the patients testified, we would like to have played an audio tape of a third patient, W.Y., who was too sick and unwilling to come to court. Well, how do we know that he's too sick and unwilling to come to court? We provided an affidavit of an investigator who talked to him. An investigator provided an affidavit that W.Y. was too sick. The investigator wasn't a doctor, was he? Certainly not, Your Honor. Is he qualified to assess whether he's too sick? He wasn't making a medical judgment. Well, why do we rely on an investigator's opinion of somebody's medical condition? The investigator recounted that W.Y. said that, I'm not going to come to court and I'll kill myself if I'm forced to come to court. All right. That's hearsay, isn't it? It is. But both sides, I would say, concede and acknowledge that he had serious medical problems and that's why he was being treated. W.Y. wasn't subpoenaed, right, for trial? He was not subpoenaed. Okay. So there's no hearing and there was no hearing on his unavailability? There was argument on his unavailability. Okay. But no hearing. No. I mean, that's a factual issue if he's unavailable or not, right? Usually. Okay. I think I understand that argument as well. Any further questions, Judge Nalbandian? Thank you, Your Honor. All right. You'll have your three minutes rebuttal, Mr. Wicker. Good morning. Good morning, Your Honor. Dermot Lynch for the United States. I want to just pick up on one thing Judge Griffin said when the opposing party was talking about this issue of whether there were systematic problems with Dr. Sewell's prescribing. I think one area of that would be the KBML prior investigation of I think it was 21 or so patients. The second point on the systematic issue is the testimony of the first witness for the government, Rochelle Gunther, who talked about how Dr. Sewell's reputation was as an easy prescriber and how she also experienced that. She was addicted to heroin and was getting around urine drug tests. She confessed that to him and nothing changed about the way she was being administered urine drug tests. I think, though, on a larger point that... I mean, the investigation was, I mean, some years removed from what happened in this case, wasn't it? The investigation... And then you have one witness who says, in my own case, there was overprescribing or not enough jumping through normal hoops. It was easy to get the medicine. But that's not systematic, is it? So I think that the other issue here, the narrow question before this court is, could a reasonable jury convict on the specific counts that the jury did convict on in this case? And as we said in our brief, most of those counts are tied specifically to a distribution of a controlled substance just after a failed urine drug test. So, I mean, you don't have to reach the question of whether or not there was systematic problems here. The issue here is there was a history of problematic prescribing, including to patients who had a history of opioid addiction. Dr. Suholtz was instructed on that specific issue. Don't prescribe to people who... Don't give people the substances to which they were addicted. And you have to do these types of reviews. You have to ask the questions about mental health. You have to ask the questions about prior substance use and substance abuse. This is something that the state of Kentucky, the Kentucky Board of Medical Licensure, said that you have to do. Those are the state rules on safe prescribing of opioids. It puts an affirmative duty on the doctor. And this is something that Dr. Munzing talked about, citing 201-KAR-9-260. There are a number of affirmative duties on the doctor if that doctor is going to prescribe controlled substances. And in the vast majority of the counts of conviction, you have a failed urine drug test, and then the next month, when Dr. Suholtz is on notice of that failed urine drug test, you have a distribution without any sort of analysis about the prior failed urine drug test. You can see that with W1. Do you think the prior investigation, finding, the interview, whatever, all of this stuff, is that awareness? What is that? Knowledge? Direct evidence of knowledge? Yes, Your Honor. I think that there are two theories of relevance to that information. The first theory, and this is what the district court found, is that it's intrinsic to the charged conduct. Under the Hardy case from the Sixth Circuit, if there's a causal or temporal connection to that prior conduct, it would be intrinsic. And here, the theory would be the KBML board investigation ended, I think, in August of 2014. And as to patient DW, he started to receive, DW, a patient who is beyond dispute that he was addicted to heroin and was getting opioid addiction treatment from Dr. Suholtz. After Dr. Suholtz is freed from the board's scrutiny, he starts to prescribe, DW, large doses of opioids. Similar, certainly slightly later, he starts also prescribing to LP, who Dr. Suholtz knew had the same prior addiction history to opioids. He starts to prescribe to both DW and to LP, both opioids and benzodiazepines, what is a dangerous combination of substances. So... Sorry, go ahead. What's the temporal link then? The temporal link is closeness in time. So you're saying close the investigation in 14, and when does the new conduct begin? So the investigation, the board order was closed in August of 2014, August 25th of 2014. The first opioid script to DW is, I don't know exactly, November of 2014. I think it's about two, maybe two and a half months. And then causal, so then the other thing would be to say that there's a causal connection, that he's free from this board scrutiny, he doesn't have to do a controlled substance log anymore, and then he starts to prescribe in a way that he committed to not prescribe because of being freed from the board scrutiny. That would be the intrinsic theory, and then the other theory would be a 404B, evidence of knowledge for what he learned in the investigation. And some of this isn't even really 404B, right? It's both, certainly the sanction itself, sure, that's 404B, but he also did a bunch of training as a result of the investigation. That's not 404B evidence even, that's just him getting sort of instruction on how he's supposed to properly prescribe. And then there were some admissions that were admitted as well. Like he admits in a letter to the board saying, urine drug testing is a valuable tool I'm going to use, I have this patient who failed two urine drug tests, I'm not going to prescribe opioids to her anymore. Well, fast forward, what is he doing with LP? LP fails urine drug tests in, I believe it's August and September of 2018, and the charge counts for LP are in September of 2018, after those two failed tests. Dr. Munzing, our expert, said there isn't sufficient analysis of those failed tests. It just says in the medical record something like, negative for all drugs. That is not sufficient according to Dr. Munzing to analyze what is properly considered as a failed urine drug test. What do you make of your friend's argument that, you know, he wasn't ignorant of all this training and he wasn't deliberately ignoring what the investigation had, or the remedial effects of it, or what he learned from all this training, but that he was still using his best medical judgment. Now, whether the jury could reject that or not, but because his defense was not, oh, I'm ignoring this or, you know, I didn't take this from the training, but that meant that this instruction shouldn't have been given. Right, so as to the deliberative instruction, two points. First of all, I think the thrust of the argument in the opening and the reply brief was, Rouhan doesn't allow it in these cases. I think that that argument, as I think you suggested, is foreclosed by Stanton. As to the second point, whether or not there was sufficient basis to have deliberate ignorance instruction here, there was. From the opening statement, Dr. Suholtz's counsel is talking about how this prescribing, he was prescribing to people who had addiction issues unbeknownst to him. He was talking about in the first cross-examination with the first government witness, he talked about how she pulled a wool over his eyes. In the briefing, right, there's constant references to, oh, we don't know about this. Well, the reason you don't know about this, as Judge Griffin was somewhat intimating, I think, is that you didn't follow up on the tests. You saw a test that said negative for all drugs, even though I'm prescribing you an opioid and a benzodiazepine, and you didn't do anything other than write that in the medical note, or you just stopped doing any testing. You consciously decided to stop doing testing. And so those are the basis for doing a deliberate ignorance instruction is if there's evidence to support, reasonable evidence to support, conscious avoidance of a high probability that some fact that issue is occurring. And here, we have that, right? We have that, we have failed urine drug tests, and then a decision to... Can I go to your first point on this in terms of Stanton?  Stanton was a case dealing with the conspiracy, right, to engage in a violation of this statute. Is there any reason that that doesn't control here, or how does the analysis transfer over here when we're not talking about deliberate ignorance to conspiracy? I think you're right. Stanton was an 846, this is 841s. I think that the language, there's certainly no... I mean, to my eye, off the top of my head, I don't see any sort of language that limits Stanton to just 846s. I think there's also the thrust of the opinion and the language used in the opinion is quite similar to the facts here, right? One of the facts in Stanton, one of the facts that this court found justified giving a deliberate ignorance instruction was... I can't remember the exact language, but failing to actually consider or take seriously or something like that urine drug tests. That's... Sure, that was done in the context of an 846, but that's the same factual predicate that we're talking about here, one of them anyway, right? That you didn't do urine drug tests, you did not take them seriously. Those are the same facts as Stanton. I don't think this court should view Stanton as distinguishable as on the 846 versus 841 ground. And just to also say, this isn't just a case about urine drug tests. Dr. Suholtz also didn't... For W.Y., W.Y.'s last imaging was in 2006. That's 15 years before the offense conduct here. That's a conscious decision not to get another objective marker of does this patient need a large dose of opioids, right? For W.Y., the evidence of improper prescribing is particularly strong because Dr. Suholtz admitted in a recorded interview with investigators that W.Y. was receiving a boatload of opioids. He was receiving 360 milligrams of morphine equivalent. That's almost four times what Dr. Munzing, the government's expert, would say was an appropriate level of prescribing. Dr. Suholtz also admitted in that same recorded interview that he was an outlier. Can I ask you a question about the instruction? Yes, you can. Your friend says that in the Hansen case, which is a more recent case in northern Kentucky, that the instruction was different or was more specific in requiring subjective knowledge or whatever it was. And he quotes a paragraph that was in that instruction that was not in this instruction. And I'm curious if that's correct, that the instructions were different. They're both 841 cases, right? Yes, Your Honor. They are both 841 and 846. And Hansen was acquitted, wasn't he? He was acquitted and there were hung counts. I did handle that prosecution. I also handled the prosecution of his severed co-defendant who was convicted last week on the same instructions in the bench trial. The same instructions as in this case or the same instructions as in Hansen? The same instructions as in Hansen. What is the difference between the instructions in these cases? First point is, as to the elements instruction here, the 841 element instruction, that is Rwan compliant, right? The issue in Rwan is whether or not the prescription was knowingly unauthorized or knowingly outside the usual course of professional practice. That language, that elements instruction, was used more or less with that language in the Suholtz case. I think that something that did happen, right, and I don't think there's actually much material difference here, but the Suholtz case used Rwan compliant elements instruction. That hasn't been challenged here. Any challenge to that instruction? I was going to say, I thought the only jury instruction was on appeal was the deliberate ignorance instruction. That's correct. The other ones were stipulated too, right? Yes. I don't know why we're arguing this. I guess maybe it's interesting, but it's not at issue. No, I think that argument would be, the argument in the footnote in the reply brief would be forfeited for a variety of reasons. It wasn't raised in the opening brief. I'm not sure, just to be correct for the record, I think there might have been some dispute about how to formulate the elements instruction, but again, there's a forfeiture waiver argument. I don't think it's an objection. I don't think it's on appeal. Yes, that's correct. It's not framed as an issue on appeal. I've just read the brief. Yes, that's absolutely correct, Your Honor. So is there a difference between the case that Judge Nalbandian is asking about in terms of a deliberate indifference instruction and the deliberate ignorance instruction? Oh, as to the elements instruction, there might be what I would consider immaterial differences. As to the deliberate ignorance instruction, I believe both use a version of the pattern, the Sixth Circuit pattern instruction. I do not believe there is a material difference between, I'd have to double check. I can correct the record if I've got this wrong, but I don't believe there's a material difference between the deliberate ignorance instruction used in the Hansen case and used in the Suholtz case. The other issue they raised is the ruling to exclude the recording of, I'm not quite sure which patient it was, that they argued that that was a reversible error. Do you want to address that? Yes, Your Honor. And so I think that there are four reasons that that is not a reversible error. First of all, there's the, Rule 807 requires that the patient requires reasonable notice. There wasn't reasonable notice here. Eight days passed. That was the finding of the district court. That would be reviewed for abusive discretion. Secondly, as Your Honor brought up, there was his claim, his just basic claim, I don't want to testify, I'm feeling a mental health issue about testifying. That's the only basis for unavailability, and I don't think that meets the standard, because there's also issues, Rule 807 requires indicia of trustworthiness. And if you actually just listen to the recording, W.Y. makes a number of inconsistent or untruthful statements in the recording. He initially says, I never failed a drug test. Then he says, yes, when he's confronted with his patient file, he said, oh yeah, actually, I did fail a drug test. There's plenty of indicia that you couldn't trust what was said on the recording, and we wouldn't have been able to. And then that sort of segues into the fourth issue, that it's harmless error, and cumulative also, if you need to reach those issues. You're out of time, but I'll give you 30 seconds if you want to wrap it up. Your Honor, I think that this is a straightforward case where we're talking about reviewing for what a reasonable jury would do, and we're talking about abuse of discretion, where we have limiting instructions given on the two largest evidentiary issues. On the sort of standard, those standards in this case, this court should affirm the judgment of the court below. Very good. Any further questions? Judge Galbandi. All right, thank you, counsel. Thank you, Mr. Winsor. Thank you. All right, three minutes rebuttal. Thank you, Your Honor. Going back to Judge Galbandian's question about the elements instruction, we did in fact object to the elements instruction. We objected to the failure to give a good faith instruction, and we submitted alternate instructions for both of those. We haven't briefed those issues, of course, because we thought the deliberate indifference instruction was the more significant failing of the district court. If there had been better elements instructions that might have counteracted some of the harm caused by the deliberate indifference instruction. I think on a larger question, we can disagree about whether the patient care was appropriate for these patients, and there were two doctors who testified in opposite directions on that question. The defense submitted a board-certified pain specialist who talked about the care of these patients and said it was appropriate in these circumstances for these patients. And it was a close case. The jury was out for two and a half days. That was as long as the government took to put on its case. We don't have the usual kind of pill mill red flags here that we see in other cases. And that made all the evidentiary issues that we briefed much more important, much more significant because it was a closer case. So the 404B introduction of this 12-year-old disciplinary case, the introduction of patient deaths, patients who died from drugs that were given by other doctors, not by Dr. Seutholz, that was unduly prejudicial and inflamed the jury to find against him on what was at best a medical negligence case. So we would ask you to reverse the entire case. But if the court's not willing to reverse the entire case, to remand to allow the introduction of the WI testimony, the tape that was not played. And we can see the importance of that because the two patients who testified, the two patients who the jury heard from, they failed to convict on those counts. And I suggest that it's really important and reasonable to assume they would have done the same on the WI counts as well. All right. Thank you, Mr. Wicker. Any further questions? All right. Thank you for your arguments. The case will be submitted.